# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SHAREEF R. KARAM,

    Plaintiff,

    v.

CHESAPEAKE DETENTION
   FACILITY, et al.,

    Defendants.

Civil Action No.:  SAG-20-1029

## MEMORANDUM OPINION

In this civil rights action, Plaintiff Shareef R. Karam alleges that Defendants Chesapeake Detention Facility, Ngozi Ezike-Ejiogu, M.D., Marjorie Warren, PSV,[1] Ifeyinwa Ibeanu, N.P., Desha Bedford, M.D., and Sacari Thomas-Mohamed, M.D. failed to provide adequate medical care. Defendant Chesapeake Detention Facility ("CDF") has moved to dismiss this action. ECF No. 12. Defendants Ngozi Ezike-Ejiogu, M.D., Ifeyinwa Ibeanu, N.P., Desha Bedford, M.D., and Sacari Thomas-Mohamed, M.D.[2] (the "Medical Defendants") have moved to dismiss the action or, alternatively, for summary judgment to be granted in their favor. ECF No. 16. Karam opposes the motions. ECF Nos. 15, 18 and 20.[3] The issues are fully briefed, and a hearing is not needed. *See* Local Rule 105.6 (D. Md. 2018). For the following reasons, Defendant CDF's motion is granted and the Medical Defendants' motion, construed as a Motion for Summary Judgment, is granted.

---

[1] Warren has not been served with the Complaint. The Complaint against her is dismissed without prejudice.

[2] The Clerk shall amend the docket to reflect the correct names of Defendants.

[3] ECF No. 18 was docketed as a supplement to the Complaint, and Medical Defendants move to strike it. ECF No. 19. Upon review of the pleading, it is a supplemental opposition and is construed as such. Accordingly, Medical Defendants' motion to strike is denied. Additionally, several of Karam's filings include a request that the court identify his counsel. The Court does not routinely appoint counsel to represent plaintiffs in civil matters. Karam has adequately presented his contentions in this case, despite the legal deficiencies identified below.

## I.  Background

In his Complaint as supplemented, Karam states that since he started taking Amitriptyline in January of 2020, he has suffered side effects including discharge from his nipples, difficulty sleeping, swelling of his testicles, and skin rash.  ECF No. 1, p. 4; ECF No. 4, p. 1; ECF No. 5, p. 2. Karam states that he was prescribed Amitriptyline to treat his back pain, but it is an anti-depressant and he was not told of its side effects.  ECF No. 1, pp. 6-7; ECF No. 4, p. 1; ECF No. 5, pp. 4-5. On an unspecified date, an unidentified staff member told Karam that he had been given the medication by mistake, and on February 27, 2020, the prescription was discontinued.  ECF No. 4, p. 2; ECF No. 5, p. 6.  Karam also states that after the Amitriptyline was discontinued he was prescribed Abilify, which he alleges caused the same side effects. ECF No. 5, p. 6.  Lastly, Karam alleges that he is borderline diabetic and is at risk of having health issues.  ECF No. 4, p. 2.

In support of their dispositive motion, Medical Defendants have provided the affidavits of Desha Bedford, M.D. (ECF No. 16-4), Ngozi Ezike-Ejiogu, M.D., (ECF No. 16-6), Ifeyinwa Ibeanu, NP, (ECF No. 16-7), and Sacari Thomas-Mohamed, M.D., (ECF No. 16-8), along with Karam's relevant medical records (ECF No. 16-5), which demonstrate that he has been treated for high blood pressure, back pain, skin rashes, and gynecomastia, and been monitored for the development of diabetes.

Dr. Bedford explains that diabetes is a medical condition characterized by too much sugar in the blood. ECF No. 16-4, p. 2, ¶ 6.  Adult onset diabetes, *e.g.* Type 2 diabetes, is a chronic condition that can develop over time.  *Id.*  Diabetes is usually diagnosed with the hemoglobin A1c test which measures average blood sugar levels for the past two to three months: normal levels are below 5.7%; 5.7-6.4% is considered prediabetic; and a level over 6.5% is diabetic.  *Id.*  If a patient's

A1c level falls within the prediabetic range, no medication is required and instead the patient should begin lifestyle changes including weight loss, healthy eating, and exercise.  *Id.*

Dr. Bedford further explains that "[g]ynecomastia is a condition characterized by enlargement or swelling of breast tissue in males." ECF No. 16-4, p. 3, ¶ 7.  Gynecomastia, a common and benign condition, is caused by an imbalance of estrogen and testosterone which can be caused by natural hormonal changes, age, medication, or health conditions, and is common in middle age and older men.  *Id.*  Sufferers of gynecomastia may experience swelling, pain, tenderness, or nipple discharge, but the condition generally does not require treatment.  *Id.*  If a medication is the cause of the gynecomastia, stopping the medication typically resolves the gynecomastia.  *Id.*, p. 4, ¶ 10.  Further, if the gynecomastia is caused by medication, it is usually not permanent.  *Id.*

Amitriptyline, also known as Elavil, is a tricyclic antidepressant that is also effective in managing chronic back pain.  ECF No. 16-4, p. 3, ¶ 8.  Dr. Bedford, Dr. Thomas-Mohamed, and Nurse Practitioner ("NP") Ibeanu each explain that in the correctional setting Amitriptyline is frequently prescribed, because it does not carry the risks of addiction or misuse related to the use of narcotics for pain management.  *Id.*; ECF No. 16-7, p. 3, ¶ 7; ECF No. 16-8, p. 4, ¶ 9.  Most patients who take Amitriptyline do not experience serious side effects. ECF No. 16-4, p. 3, ¶ 8.  "Common side effects of Amitriptyline include cardiac symptoms like arrythmia or heart palpitations, constipation, diarrhea, blurred vision, a skin rash, swelling of the face or tongue, dizziness, dry mouth, drowsiness, difficulty urinating, numbness and tingling in arms and legs, confusion, extrapyramidal symptoms (abnormal body movement), exacerbation of psychiatric symptoms, nausea, vomiting, weight gain, and headaches.  Swelling or enlargement of the breasts may occur in males but is a very rare side effect." ECF No. 16-4, p. 3, ¶ 9.

Karam's relevant medical records demonstrate that on January 9, 2019, NP Ibeanu saw Karam because of complaints of back pain.  ECF No. 16-5, pp. 280-81.  Karam stated that his prescribed medication did not help, and he complained of lumbar spine tenderness and mild pain with motion.  Ibeanu prescribed a muscle relaxer (Robaxin), Tylenol Extra Strength, a nonsteroidal anti-inflammatory (Meloxicam), and Amitriptyline. *Id.*, p. 281.  Ibeanu advised Karam regarding the course of his treatment and ordered a follow-up provider appointment.  Ibeanu avers that he advised Karam of the common side effects of the prescribed medications and specifically that he advised Karam that Amitriptyline could cause drowsiness, dizziness, dry mouth, blurred vision, constipation and weight gain.  Ibeanu also advised Karam that Amitriptyline could result in development of gynecomastia, but that the condition was a rare side effect.  Karam indicated he understood and consented to the offered course of treatment.  Ibeanu denies mistakenly prescribing Amitriptyline for Karam.  ECF No. 16-7, p. 3,  ¶ 7.

Karam submitted sick call slips complaining of back pain on January 10 and 31, 2019. ECF No. 16-5, pp. 48-51.

On February 11, 2019, Karam was evaluated by Dr. Bedford in response to continued complaints of low back pain.  ECF No. 16-4, p. 4, ¶ 14; ECF No. 16-5, pp. 276-78.  Karam did not complain of any issues with his breasts, and Dr. Bedford did not note skin lesions or gynecomastia. Dr. Bedford renewed Karam's prescriptions for Amitriptyline, Meloxicam, and Robaxin and educated Karam regarding his medical issues, course of treatment, and when to follow up with medical staff for evaluation, including if he experienced side effects or worsening of symptoms. *Id.*  Dr. Bedford denies mistakenly prescribing Amitriptyline.  ECF No. 16-4, p. 5, ¶ 15.  Dr. Bedford avers that she explained to Karam the course of his treatment and informed him of common side effects of Amitriptyline, including dizziness, extrapyramidal symptoms,

exacerbation of psychiatric symptoms, cardiac symptoms including heart palpitations, nausea, vomiting, and weight gain. *Id.* Dr. Bedford further avers that the standard of care requires a reasonable medical provider to inform patients of common potential side effects, but does not obligate the provider to inform a patient of every potential side effect of medication, particularly if the risk of that side effect is low. *Id.* Gynecomastia is a very rare side effect of Amitriptyline, and Dr. Bedford did not discuss with Karam the low likelihood of it occurring. *Id.*

On March 19, 2019, Karam was evaluated by Dr. Bedford due to complaints of pain in both hands. ECF No. 16-5, pp. 272-74. Karam did not report any testicular abnormalities, nor did he exhibit gynecomastia or any other abnormalities in his extremities. Dr. Bedford ordered laboratory testing and directed Karam to return for a follow up appointment. *Id.*

Dr. Bedford next saw Karam on April 29, 2019, because of his continued complaint of back pain. ECF No. 16-5, pp. 270-71. Karam reported that his prescribed medications to treat his back pain were not working and asked that the dosage be increased. *Id.* He reported no testicular abnormalities or skin rash. On examination, his skin appeared normal. Dr. Bedford counseled Karam regarding weight loss and exercise. In light of Karam's complaints of worsening back pain, Dr. Bedford increased Karam's Amitriptyline dosage. *Id.* He also had active prescriptions for Meloxicam and Robaxin. *Id.*

On May 28, 2019, NP Ibeanu evaluated Karam because of his complaints of lower back pain radiating down his right leg. ECF No. 16-5, pp. 268-69. Karam reported that the pain had started three months earlier. He also reported pain in both hands. While Karam did not appear in distress, he reported tenderness and mild pain with motion in his lumbar spine. There was no evidence of gynecomastia or rash. Ibeanu added a prescription for Tylenol Extra Strength to

Karam's active prescriptions for Meloxicam and Robaxin. *Id.* She also educated Karam regarding his course of treatment. *Id*

Karam submitted a sick call slip on June 18, 2019, complaining of foot pain. ECF No. 16-5, p. 41. A nurse evaluated Karam for complaints of a rash and itchiness on his left foot. The nurse noted a small rash with some hyperpigmentation on the left foot, and Karam reported he scratched the area too hard at times. *Id.*, pp. 266-67. The nurse applied hydrocortisone. *Id.*

Karam submitted a sick call slip on July 14, 2019, requesting additional hydrocortisone. ECF No. 16-5, p. 40. NP Ibeanu saw Karam the following day: Karam denied any other medical concerns and Ibeanu renewed the hydrocortisone prescription. ECF No. 16-5, pp. 264-65.

On July 30, 2019, Dr. Bedford saw Karam in the chronic care clinic. ECF No. 16-5, pp. 261-63. Karam's cardiovascular symptoms were stable. He reported that the medication prescribed for his lower back was working, and he had no complaints. He reported a rash "between his butt cheeks" and explained his use of hydrocortisone did not improve the condition. *Id.* Dr. Bedford determined that Karam's hypertension, chronic back pain, and dermatitis were each stable. She continued Karam's prescriptions for Amitriptyline and Robaxin and also ordered an antifungal cream. *Id.* Dr. Bedford discussed with Karam the risk of continued use of Robaxin for long term pain relief, and its side effects as well as the side effects of Amitriptyline and Tylenol. *Id.*; ECF No. 16-4, p. 8, ¶ 28.

Dr. Bedford next evaluated Karam on September 25, 2019, in regard to Karam's high blood pressure. ECF No. 16-5, pp. 258-60. Karam reported headaches, but otherwise appeared in no apparent distress and had no skin lesions. Dr. Bedford ordered hydrochlorothiazide; a diuretic used to treat high blood pressure. *Id.*

NP Ibeanu examined Karam on October 2, 2019, for his annual exam.  ECF No. 16-5, pp. 248-51.  Karam reported allergy symptoms.  *Id*.  Examination demonstrated that he was not in any apparent distress.  His breasts were bilaterally symmetrical with no dimpling, and his lymph nodes were normal.  Ibeanu prescribed allergy medications and ordered laboratory testing and a provider follow up.  *Id*.

Dr. Thomas-Mohamed evaluated Karam on November 27, 2019 for hypertension and low back pain.  ECF No. 16-5, pp. 245-47.  Karam denied chest pain, shortness of breath, headache, dizziness, or swelling.  He reported that his low back pain had improved with the use of Amitriptyline and Meloxicam.  Karam did not report gynecomastia, nipple changes, or symptoms consistent with side effects of Amitriptyline.  *Id*.  Karam advised the doctor that he ate a lot of chips, party mix, pastries, and cookies from the commissary.  *Id*.  During examination, Dr. Thomas-Mohamed did not observe any chest abnormalities, including gynecomastia or nipple discharge.  Additionally, there were no signs of significant lumbar spine abnormalities.  *Id*.  In light of the stability of Karam's chronic back pain and the limited benefit of long term use of muscle relaxers to control back pain, Karam's Robaxin prescription was discontinued.  *Id*.  Dr. Thomas-Mohamed ordered a hemoglobin A1c test to rule out diabetes, in light of Karam's previous laboratory tests which showed elevated glucose and triglycerides.  *Id*.  Dr. Thomas-Mohamed renewed Karam's prescriptions, including Amitriptyline, and counseled Karam to decrease his commissary purchases of fried and processed foods and to increase his exercise.  He also discussed with Karam the risks and benefits of his course of treatment, including side effects.  *Id*.  Dr. Thomas-Mohamed discussed common side effects of Karam's medications, focusing on common side effects, and confirmed that Amitriptyline could be safely taken with Karam's other medications.  ECF No. 16-8, p. 3, ¶ 7.  Karam indicated that he understood.  He was directed to

7

follow up if his condition worsened or showed no improvement.  Karam was scheduled to return for follow up in three months.  Dr. Thomas-Mohamed did not discuss the risk of gynecomastia from the use of Amitriptyline, because the likelihood of that occurring was very low.  *Id.*, p. 4, ¶ 10.

Karam submitted a sick call slip on February 9, 2020, complaining of pain on the left side of his chest.  ECF No. 16-5, p. 36.  The following day he was seen by NP Ibeanu.  *Id.*, pp. 237-38.  At that time, Karam reported an increase in the size of his left breast, which he said he noticed the previous day while bathing.  He reported tenderness around his left breast and occasional tenderness around the areola, which was not painful or tender at the time of exam.  There was no discharge, mass or redness.  Ibeanu noted that Karam was prescribed Amitriptyline which carried a risk of breast swelling in men and discontinued the medication, noting that she would monitor Karam, who denied any other concerns.  *Id.*

On February 12, 2020, Karam filed a sick call slip complaining of nightmares and an inability to sleep.  ECF No. 16-5, p. 33.  When Karam was evaluated by a nurse the following day, he reported feeling "strange" and stated that his "chest ha[d] grown."  *Id.*, p. 236.  Karam lifted his shirt and the nurse noted an increase of subcutaneous tissue in the bilateral pectoral area.  There was no discoloration, and Karam denied pain or shortness of breath.  *Id.*  The nurse requested a psychiatric consultation due to Karam's complaints of nightmares and insomnia, and also, at Karam's request, placed him on the chronic care clinic list.  *Id.*

On February 14, 2020, Karam submitted another sick call slip, this time complaining of foot and back pain.  ECF No. 16-5, p. 35.  That same day, Dr. Ezike-Ejiogu evaluated Karam.  ECF No. 16-5, pp. 230-32; ECF No. 16-5, pp. 2-4, ¶ 7. During the examination, Karam complained of gynecomastia, noting a larger left breast and asking about side effects of Amitriptyline.

Dr. Ezike-Ejiogu advised Karam that gynecomastia can occur as a male ages, due to hormonal imbalances.  He also explained that Amitriptyline can cause gynecomastia, but it was a rare side effect which usually subsided when the medication was stopped.  Karam reported that he noticed breast asymmetry one week earlier and had no prior knowledge of one side being larger than the other.  *Id.*  Karam denied pain, nipple discharge, or family history of breast cancer.  Karam also reported difficulty sleeping after the Amitriptyline was discontinued.  *Id.*  On examination, Dr. Ezike-Ejiogu noted bilateral gynecomastia with no skin color change, inverted nipples, or nipple discharge.  *Id.*  Karam's breast tissue was not tender.  He palpated a nodule in Karam's left breast but found no palpable lymph nodes.  *Id.*  Dr. Ezike-Ejiogu submitted a request for an ultrasound of Karam's right breast.  *Id.*  The doctor also determined that Karam was suffering from withdrawal symptoms from the abrupt discontinuation of Amitriptyline.  He restarted the medication at a lower dose and directed it be tapered over two weeks and then discontinued.  *Id.*  Dr. Ezike-Ejiogu explained to Karam that an abrupt discontinuation of Amitriptyline could lead to withdrawal symptoms in some patients, and noted that his sleep disruptions could have been such a symptom. ECF No. 16-6, p. 2, ¶ 7.  Karam asked if the gynecomastia would resolve, since he had been off Amitriptyline for over a week, but he still had the gynecomastia.  Dr. Ezike-Ejiogu advised Karam that the side effects of the medication usually resolved when the medication was discontinued, but it could take a month or two for the symptoms to resolve.  Karam indicated his understanding and consented to restarting and tapering the Amitriptyline.  *Id.*

That same day, Karam was also seen by NP Ibeanu to renew his medications.  ECF No. 16-5, pp. 232-33.  Karam requested an increase in the dosage of his pain medication, advising that it took too long to control his back pain.  Karam's prescriptions for Tylenol and Meloxicam were renewed.  *Id.*

Karam was evaluated by psychiatrist Marjorie Warren on February 19, 2020. ECF No. 16-5, pp. 8-13. Warren noted Karam's medical history and prescribed Abilify, an antipsychotic medication, for Karam's symptoms of psychosis, including hallucinations, and directed he follow up with medical staff to assess any organic reasons for Karam's reported symptoms. *Id.*, pp. 8-13, 220-21.

Dr. Bedford examined Karam on February 21, 2020. ECF No. 16-5, pp. 212-214. Karam reported audiovisual hallucinations for approximately two years, which increased since he started taking Amitriptyline. *Id.* Karam was calm and cooperative and denied being in discomfort or pain. Dr. Bedford noted that she did not believe Karam's hallucinations were medical, but ordered laboratory testing to further evaluate Karam's complaints. She also discontinued the Amitriptyline. *Id.*, p. 214. The next day, Karam's blood work showed his Alc level was 6.0%. *Id.*, pp. 66-69.

On February 24, 2020, Karam submitted a sick call slip requesting antifungal and hydrocortisone cream. ECF No. 16-5, p. 34. NP Ibeanu evaluated Karam and noted Karam's history of athlete's food and dermatitis. Blisters were observed on Karam's foot, but he did not offer any other complaints. Ibeanu renewed Karam's medications. *Id.*, 209-10.

Dr. Bedford reviewed Karam's blood work with him on February 27, 2020. ECF No. 16-5, p. 197. Karam's comprehensive blood panel, basic metabolic panel, urinalysis, hepatitis panel, and thyroid stimulating hormone did not show any significant abnormalities. *Id.* Karam's A1c was slightly elevated and Dr. Bedford discussed this result with him, emphasizing the importance of diet and exercise to control his glucose. *Id.*, p. 198. Dr. Bedford did not believe Karam's psychiatric symptoms were organic in nature, and she submitted a request for a psychiatric consultation to assess Karam's complaints of hallucinations. *Id.* Dr. Bedford directed Karam

return for follow up in three months and for further monitoring of Karam's A1c levels. *Id.* Karam's next blood work showed an A1c level of 6.3%. *Id.*, p. 218.

On March 4, 2020, Karam submitted sick call slips complaining of back pain and requesting mental health care. ECF No. 16-5, pp. 31-32. The following day, NP Ibeanu evaluated Karam for his complaints of back pain. *Id.*, pp. 195-96. Karam advised that his back pain had worsened since the Amitriptyline had been discontinued and that he took Mobic once a day. He complained of tenderness in the lumbar spine and mild pain with motion. He denied any numbness or tingling. Karam also complained of left breast pain beginning three days earlier. Ibeanu reviewed Karam's chart and noted that a consultation had been submitted for a sonogram, but no results were available. She referred Karam to chronic care for follow up and prescribed Baclofen, a muscle relaxer. *Id.*, p. 196.

On March 6, 2020, the ultrasound of Karam's left breast was unremarkable, showing no evidence of a solid or cystic lesion. ECF No. 16-5, p. 282. Upon his return to CDF, after the exam, Karam advised the nurse that he did not have any pain or discomfort. *Id.*, p. 192. Dr. Bedford also saw Karam that day and noted the ultrasound was normal. *Id.*, pp. 189-91. Dr. Bedford reviewed Karam's recent laboratory results with him and explained that it showed increased cholesterol and A1c levels. *Id.*, p. 189. At that time, Karam's right breast was symmetrical with no dimpling and no masses or lesions. *Id.*, p. 190. Karam's left breast, however, was asymmetrical with a mass. *Id.* Karam's nipples were normal and without discharge. The axillary lymph nodes were also normal. *Id.* Dr. Bedford assessed Karam as having a stable breast mass that did not then require further treatment. *Id.*, pp. 190-91. She also assessed Karam as prediabetic, discussed appropriate diet and exercise to control his condition, and directed a reevaluation in three months. *Id.*, p. 191.

Dr. Bedford avers that the ultrasound ruled out the presence of a significant abnormality such as a cancerous tumor.  ECF No. 16-4, p. 14, ¶ 49.  The ultrasound, coupled with Karam's presentation, demonstrated that he does not require additional treatment, diagnostic testing, or medication for his left breast.  *Id.*  Further, according to Dr. Bedford, the diagnostic testing and clinical presentation confirm that the gynecomastia will not cause harm or injury.  *Id.*

On May 11, 2020, Karam's Abilify prescription was stopped at his request, because he was concerned that it had caused the breast mass.  ECF No. 16-5, pp. 3-7.

Karam submitted sick call slips on April 8 and 14, 2020, seeking refills of his medications.  ECF No. 16-5, pp. 25-26.  During an evaluation with NP Ibeanu on April 14, 2020, Karam reported suffering from jock itch and requested medication, denying any other concerns.  *Id.*, p. 187.  Ibeanu ordered Miconazole Nitrate and antifungal cream.  *Id.*, p. 188.

Karam submitted a sick call slip on May 3, 2020, seeking to refill his medication, and a sick call slip on May 9, 2020, complaining of dry skin.  ECF No. 16-5, pp. 23-24.  On May 11, 2020, Ibeanu renewed Karam's prescription for Miconazole Nitrate.  *Id.*, p. 186.

Karam submitted sick call slips on May 13 and 19, 2020, complaining of back pain.  ECF No. 16-5, pp. 21-22.  His prescriptions for Meloxicam and Miconazole Nitrate were renewed by NP Ibeanu on May 20, 2020.  *Id.*  Ibeanu avers that she believes that Karam's skin rashes were not caused by Amitriptyline, as the rashes were consistent with fungal infections and were not urticarial (triggered by a reaction to food, medicine, or other irritants) in nature.  ECF No. 16-7, p. 5, ¶ 16.

On May 26, 2020, Karam asked to have a blood test to check his diabetic level.  ECF No. 16-5, p. 20.  The following day Ibeanu reviewed Karam's request and ordered testing (*id.*, p. 183) which showed Karam's A1c level was 6.1%.  *Id.*, p. 283.

Dr. Bedford avers that Karam has not received a COVID-19 test, because testing supplies are limited, and testing is only provided when a patient exhibits symptom suggesting a COVID-19 infection.  ECF No. 16-4, p. 2, ¶ 5.  Karam has not complained of symptoms consistent with COVID-19.  *Id.*  Dr. Bedford further avers that she was not aware Karam had any concerns regarding COVID-19 prior to his filing this case.  *Id.*, p. 16, ¶ 60.

Dr. Thomas-Mohamed avers that he is no longer employed at CDF and was not employed at CDF when COVID-19 became a concern.  He was therefore not aware of Karam's COVID-19 concerns.  ECF No. 16-8, p. 2, ¶ 5.  Dr. Ezike-Ejiogu was likewise unaware of Karam's concerns related to diabetes or COVID-19 prior to Karam's filing this lawsuit, and has not been involved in Karam's treatment for either issue.  ECF No. 16-6, p. 2, ¶ 6.  NP Ibeanu and Dr. Bedford each aver that they were not aware of Karam's COVID-19 concerns.  ECF No. 16-4, p. 16, ¶ 60; ECF No. 16-7, p. 6, ¶ 18.

Karam's medical records do not demonstrate that he has suffered any side effects from Amitriptyline.  ECF No. 16-5; ECF No. 16-4, p. 16, ¶ 59.  Dr. Bedford explains that since the gynecomastia did not resolve when the Amitriptyline was stopped, it is unlikely that Amitriptyline caused the gynecomastia.  ECF No. 16-4, p. 16, ¶ 59.  There is no record that Karam complained to any provider of nipple discharge or testicular swelling, and multiple care providers specifically ruled out nipple discharge.  *Id.*  Karam's sole complaint of difficulty sleeping occurred after the discontinuation of the Amitriptyline.  Additionally, Karam's skin rashes were either fungal or merely dry skin, and were not related to his use of Amitriptyline.  *Id.*

Dr. Bedford avers that Karam's A1c levels and other medical conditions have been monitored and will continue to be monitored.  ECF No. 16-4, p. 16, ¶ 60.  Karam has been educated regarding the necessity of proper diet and exercise to avoid developing Type 2 diabetes. *Id.*

## II. Standard of Review

### A.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 423 (2018); *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Twombly*, 550 U.S. at 573;

*see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)). But, the Supreme Court has explained that a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted; alteration in *Twombly*).

Moreover, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570); *see Paradise Wire & Cable Defined Benefit Pension Fund Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted); *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). Put another way, "an unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause

of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

A court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Comm'w of Va.*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 135 S. Ct. 346, 346 (2014) (per curiam).

Courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quotation marks and citation omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 533 F.3d 334, 336 (4th Cir. 2009); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 745 F.3d 131, 148 (4th Cir. 2014). However, because Rule 12(b)(6) "is intended [only]

to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear [ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis in *Goodman*); *see Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007). "Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Under limited circumstances, however, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor and City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

A court may consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166; *see also* Fed. R. Civ. P. 10(c); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Paradise Wire & Cable*, 918 F.3d at 318. Notably, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting

allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Goines*, 822 F.3d at 167. Therefore, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Id.* (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)).

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, __U.S.__ , 138 S. Ct. 558 (2017); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (citation omitted); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

18

Here, Defendant CDF argues that it is not a party amenable to suit under 42 U.S.C. § 1983, that it is entitled to Eleventh Amendment immunity, and that Karam has failed to state a claim of deliberate indifference. The Medical Defendants argue that Karam's claims do not survive scrutiny under Rule 12(b)(6), and, in the alternative, that they are entitled to summary judgment. Medical Defendants provide the affidavits of Karam's medical providers, as well as copies of his medical records. These documents are not intrinsic to Karam's Complaint, and may only be considered in the context of a motion for summary judgment.

## B.

As noted, the Medical Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc.*, 788 F. Supp. 2d at 436-37.

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger,* 510 F.3d at 450. However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. 2016) (per curiam). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation

to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

The Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. *See Moret v. Harvey*, 381 F. Supp. 2d 458, 464 (D. Md. 2005). Karam was provided such notice by the defendants. He also received notification from the Clerk of Defendants' dispositive filing and his opportunity to reply with exhibits and declarations. ECF No. 15.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co*, 637 F.3d at 448-49; *see Putney v. Likin*, 656 F. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed

discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule

56(d) affidavit. *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). "This is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Karam has not filed an affidavit under Rule 56(d), nor has he requested discovery.  Further, Defendants have provided Karam with a detailed accounting of events and the timeline relevant to his claims, through the documents filed in support of their motion.  Thus, the Court is satisfied that it is appropriate to address Medical Defendants' Motion as one for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon*, 890 F.3d at 470.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.,* 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). And, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002); *see Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs*., 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Notably, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, the

trial court may not make credibility determinations on summary judgment. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

Because Karam is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the Court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323-24).

In sum, to counter a motion for summary judgment, there must be a genuine dispute as to material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law." *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).

### III. Discussion

### A. CDF

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id.* (citing *Florida Dep't of Health v. Florida Nursing Home Ass'n*, 450 U.S. 147 (1981) (per curiam)). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Halderman*, 465 U.S. at 100 (emphasis in original). Thus, Karam's federal complaint against CDF, a sub-unit of the Maryland State Department of Public Safety and Correctional Services, is barred by the Eleventh Amendment. The Court need not and does not address CDF's additional defenses.

### B. Medical Defendants

"The constitutional protections afforded a pre-trial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment." *Barnes v. Wilson*, 110 F.Supp.3d 624, 629 (D. Md. 2015) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). "Pretrial detainees are entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment." *Young v. City of Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243-44 (1983); *Hill v. Nicodemus*, 979 F.2d 987, 991-92 (4th Cir. 1992). Thus, deliberate indifference to the serious

medical needs of a pretrial detainee violates the Due Process Clause.  *Id.* (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (concluding that, because it is sufficient for liability under the 8th Amendment, "deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial"); *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir.1999) (applying deliberate indifference standard to pretrial detainee's claim that he was denied needed medical treatment), *cert. denied*, 529 U.S. 1067 (2000); *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir.1990) ("The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee.")).

To state a claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention.'"  *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839-40.  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

The undisputed evidence before the Court establishes that Karam received constitutionally adequate medical care.  The affidavits of Karam's medical providers, along with his medical records, demonstrate that he was not erroneously prescribed Amitriptyline as he alleges.  Rather, he was prescribed Amitriptyline to treat his chronic low back pain.  Medical Defendants contend that gynecomastia is a rare, benign side effect of using Amitriptyline and dispute that Karam's gynecomastia was caused by his use of Amitriptyline, as evidenced by its failure to resolve after the Amitriptyline was discontinued.  Additionally, the medical records and affidavits establish that Karam was advised of the common side effects of using Amitriptyline and that when he reported gynecomastia, the Amitriptyline was discontinued, out of an abundance of caution.  Karam's

ultrasound was unremarkable.   No further treatment for the gynecomastia was indicated.  Even if Medical Defendants failed to advise Karam of the possibility of developing gynecomastia from the use of Amitriptyline, and such failure constituted a breach of the professional standard of care, such a claim rises to nothing more than medical negligence, which is not cognizable in a § 1983 action. *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle,* 429 at 106); *see also Scinto*, 841 F.3d at 225 ("Deliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result."); *Russell v. Sheffer*, 528 F.2d 318, 318 (4th Cir. 1975) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim . . . .")

The medical records further establish that Karam received regular blood work to monitor his A1c level and that he was regularly counselled on the need to lose weight, eat nutritiously, and exercise.  Karam's A1c levels remained in the prediabetic range, and no further medical care was necessary.

Lastly, Karam never reported any COVID-19 systems or expressed any concerns regarding COVID-19 to any of the named Defendants.  Given the dearth of available testing for COVID-19, Karam's lack of symptoms, and his failure to raise his concerns with Medical Defendants, there can be no basis to conclude that Medical Defendants were deliberately indifferent to a serious medical need.

Viewing the evidence in the light most favorable to Karam, the Court cannot find that the Medical Defendants were deliberately indifferent to his needs.  Defendants continuously evaluated Karam's conditions, ordered additional diagnostic testing, and responded to his complaints.  None of the Medical Defendants' decisions regarding Karam's care amounted to an act or omission "for

the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)).

Because Medical Defendants and other medical providers gave regular attention to Karam's medical conditions, the Court concludes that the record, even viewed in the light most favorable to Karam, does not support a finding that they acted with deliberate indifference to his medical needs. In sum, Karam has not shown that the Medical Defendants exhibited a callous disregard for his serious medical need, *see Estelle*, 429 U.S. at 105-06. Accordingly, the Court concludes that there is no genuine issue of material fact on Karam's constitutional claims, and the Court will grant the Medical Defendants' Motion. The Court need not and does not address the Medical Defendants' remaining arguments.[4]

### IV.  Conclusion

For the foregoing reasons, the motion to strike shall be denied. The suit shall be dismissed without prejudice as to Defendant Warren. CDF's Motion to Dismiss Karam's federal claim is granted. The Medical Defendants' motion, construed as a motion for summary judgment, is also granted as to Karam's federal claims. Karam's state law claims are dismissed without prejudice.

An Order follows.

DATED:  December 2, 2020                          _____/s/_____

                                                 Stephanie A. Gallagher
                                                 United States District Judge

---

[4] The Court declines to consider any state tort claims Karam has advanced. "When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction." *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-727 (1966)).